UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL I. SLOAN, | Case No. 11-CV-01439-WQH (JMA) |
| Plaintiff, | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DOC. 9] AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT [DOC. 11]** |
| v. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Michael I. Sloan ("Plaintiff") seeks judicial review of Defendant Social Security Commissioner Michael J. Astrue's ("Defendant") determination that he is not entitled to disability insurance benefits.  Plaintiff has filed a Motion for Summary Judgment and Defendant has filed a Cross-Motion for Summary Judgment.  For the reasons set forth below, the Court recommends Plaintiff's motion be **GRANTED**, Defendant's cross-motion for summary judgment be **DENIED**, and the case be remanded for further proceedings.

# I.  PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on March 29, 2007 alleging a disability onset date of March 1, 2002.  (Admin. R. at 116-30.)  Plaintiff's claim

was denied initially on July 18, 2007, and again upon reconsideration on December 18, 2007.  (Id. at 47-50, 56-59.)  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Id. at 61.)  An administrative hearing was conducted on February 4, 2010 by ALJ James S. Carletti, who determined that Plaintiff was not disabled.  (Id. at 13-20.)  Plaintiff requested a review of the ALJ's decision; the Appeals Council for the Social Security Administration denied Plaintiff's request for review on May 10, 2011.  (Id. at 1-3.)  Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

**II.  FACTUAL BACKGROUND**

Plaintiff was born on January 9, 1950.  (Id. at 118.)  Upon completion of high school in 1968, he volunteered for the United States Marine Corps. (Id. at 119, 795.) He was deployed to Vietnam where he was involved in combat from December 1968 to October 1969.  (Id. at 30, 795.)  On July 14, 1972, he separated from the Marine Corps. (Id. at 119.)

Plaintiff has worked as a manager (1984-95), regional manager (1995-97; 1998-99), implementation manager (1997), and a project manager (1997-98; 1999) in the information technology field.  (Id. at 200, 204, 794.)  In addition, he worked as a pedicab driver periodically in 2001 and 2002.  (Id. at 27.)  He received a Master's Degree in Business from Georgetown University in 1986 and a Master's Degree in Information Technology from George Washington University in 1996.  (Id. at 27, 794.)

Plaintiff alleges he is disabled due to Posttraumatic Stress Disorder ("PTSD"). (Id. at 191.)  Plaintiff received a disability rating of 100% from the Department of Veteran's Affairs ("VA") in February 2004.  (Id. at 28.)

/ /

/ /

/ /

/ /

/ /

/ /

11cv01439

**III.  MEDICAL EVIDENCE**

**A.    VA San Diego Healthcare System, Treating Psychologists and Treating Physicians (1999-2009)[1]**

Virtually all of the medical records contained in the administrative record before the Court relate to treatment received by Plaintiff at the VA.  On December 13, 1999, Plaintiff self-reported to the VA to seek treatment for his alcohol dependence.  (Id. at 598-99.)  During his initial consultation, Plaintiff was assigned a Global Assessment of Functioning ("GAF") score of 40.[2]  (Id. at 599.)  On the same date, Plaintiff participated in his first group therapy session where he acknowledged that all of his life problems had been alcohol use-related.  (Id. at 597-98.)  On December 17, 1999, Plaintiff self-reported to an inpatient alcohol treatment program at the VA.  (Id. at 592-93.)  Plaintiff completed the inpatient alcohol treatment program and was discharged on January 14, 2000.  (Id. at 423.)  Upon discharge from the inpatient program, Plaintiff was assigned a GAF score of 60.[3]  (Id. at 423, 622.)  Shortly thereafter, on January 19, 2000, Plaintiff moved into the Wayback Recovery Home.  (Id. at 568.)

On March 13, 2000, Plaintiff underwent a PTSD evaluation pursuant to a referral from his Alcohol and Drug Treatment Program.  (Id. at 558-62.)  Plaintiff complained of nightmares, distressing memories, and hypervigilance.  (Id. at 559.)  He reported

---

[1] The Court notes that Plaintiff's medical records from 2006 were not included in the Administrative Record.

[2] The Global Assessment of Functioning scale, or GAF scale, is a numeric scale (0 through 100) used by mental health practitioners to rate social, occupational, and psychological functioning, with lower numbers representing more severe symptoms, difficulties, or impairments.  The scale is presented in the Diagnostic and Statistical Manual of Mental Disorders.  A GAF of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition Text Revision (2000) (DSM-IV), 32.

[3] A GAF of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within the household, but generally functioning pretty well, has some meaningful interpersonal relationships.)"  DSM-IV, 32.

beginning heavy beer drinking in Vietnam, which increased in frequency over the years, and that drinking daily began about six months prior to his last drink on December 8, 1999.  (Id.)  He also reported having nightmares that focused on a firefight and a helicopter crash he was involved in while deployed to Vietnam from December 1968 to October 1969.  (Id. at 560.)  Plaintiff described being hypervigilant and hiding a sense of intense fear related to his combat exposure.  (Id.)  Plaintiff was diagnosed with Alcohol Dependence with Physiological Dependence in Early Full Remission and Chronic PTSD by Dr. Gershwin, a VA psychiatrist.  (Id. at 561.)  Additionally, Dr. Gershwin assigned Plaintiff a GAF score of 45.[4]  (Id. at 562.)

Plaintiff met regularly with Dr. Jeffrey L. Matloff, a staff psychologist at the VA, over the course of six years (2000-2006) for individual and group psychotherapy sessions.  At his first group psychotherapy session in April of 2000, Plaintiff reported to Dr. Matloff that he was coping reasonably well with his PTSD symptoms by avoiding reminders.  (Id. at 788.)  Two months later, he reported having difficulty coping with his PTSD symptoms, but felt somewhat stable in his sobriety.  (Id. at 772.)  Plaintiff expressed frustration with the VA for its slowness in recognizing his combat-related injuries.  (Id. at 784.)  He also reported finding a job as a pedicab driver for 50 hours per week.  (Id. at 782.)  On May 15, 2000, Dr. Matloff diagnosed Plaintiff with PTSD and Alcohol Dependence in Early Remission.  (Id. at 781.)

During the second half of 2000, Plaintiff reported to Dr. Matloff that he was more troubled by his PTSD symptoms, including dreams and intrusive recollections.  (Id. at 768.)  He also described his sleep as being more fitful, and he did not want any medication to aid his sleep.  (Id.)  On November 20, 2000, Dr. Matloff's sole diagnosis was PTSD.  (Id. at 747.)

/ /

---

[4] A GAF of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  (DSM-IV), 32.

11cv01439

On November 17, 2000, Plaintiff underwent a physical examination by Dr. Hilda Thorisdottir, a staff physician at the VA. (Id. at 747-50.) He reported always having poor sleep, as well as having nightmares two to three nights per week. (Id. at 748.) He stated that his PTSD was not diagnosed until December 1999. (Id.) He reported having flashbacks during the day, depending on his level of activity. (Id.) The flashbacks were triggered by smells, burning pork, heavy rain, explosions, and loud noises. (Id.) As a result of the flashbacks, he would hyperventilate, become anxious, and break out in a sweat. (Id.) Plaintiff also mentioned that he was very concerned about becoming dependent on medications. (Id.)

Over the course of 2001, Plaintiff reported to Dr. Matloff that he was experiencing a moderate increase in his PTSD symptoms and was feeling lonely and isolated, especially after the September 11th terrorist attacks. (Id. at 723, 742, 746.) He also reported having difficulty dealing with unstructured time. (Id. at 733.) He expressed an interest in medication, but was unwilling to consider taking any at the time. (Id.) Dr. Matloff advised him to increase his leisure activities so that he would have less time to focus on his PTSD symptoms. (Id.)

In the first half of 2002, Plaintiff reported to Dr. Matloff that he was having trouble with insomnia and nightmares, but felt that he was coping with it better and still preferred to not take medication. (Id. at 709, 717, 719.) In June of 2002, he expressed to Dr. Matloff that he was not in crisis and felt as though he had reached a plateau in his life. (Id. at 703.) He also recognized that he might never be able to work in his former profession again. (Id.)

On September 3, 2002, Dr. Matloff wrote a letter summarizing Plaintiff's Alcohol Dependence and PTSD history. (Id. at 609-10.) Dr. Matloff explained that Plaintiff's symptoms included intrusive recollections and nightmares, inability to fall asleep and stay asleep, isolation, and hypervigilance. (Id. at 609.) He described Plaintiff as a person in recovery who had not participated in psychotropic medication treatment. (Id.) Dr. Matloff noted that perhaps because of Plaintiff's high educational attainment and

verbal skills, he frequently presented as more functional than his actual behavior.  (Id.)
Dr. Matloff's diagnosis was Delayed Onset PTSD.  (Id.)  Further, he assigned Plaintiff a
GAF score of 40.[5]  (Id. at 610.) Dr. Matloff opined that Plaintiff was unlikely to ever
return to any kind of employment on a regular basis and that Plaintiff appeared to be
permanently and totally disabled.   (Id.)

In early 2003, Plaintiff reported to Dr. Matloff that he was having increased
physical problems from working as a pedicab driver.  (Id. at 694.)  He also reported
having increased PTSD symptoms, including disrupted sleep due to increased media
coverage of the war.  (Id. at 690.)  In addition, he felt he was able to tolerate his
intrusive symptoms and anxiety somewhat better when dealing with the anniversary of
his being wounded in Vietnam.  (Id. at 683.)

On April 25, 2003, the VA issued a decision that increased Plaintiff's 50%
disabling rating to 70%, effective March 31, 2000.  (Id. at 253-55.)  The VA also granted
his entitlement to individual unemployability, effective March 31, 2000.  (Id. at 253.)  The
rating was based on findings that indicated Plaintiff had serious social and industrial
impairments with difficulty in adapting to stressful circumstances, poor impulse control,
decreased concentration, as well as other symptoms of PTSD.  (Id. at  255.)  Based on
these symptoms, the VA found that Plaintiff was not totally disabled.  (Id. at 255.)

In the latter part of 2003, Plaintiff met with Dr. Matloff twice.  (Id. at 664, 670.)
Dr. Matloff noted that Plaintiff appeared to be coping with his PTSD symptoms through
activity and exercise.  (Id. at 664.)

Similarly, in 2004, Plaintiff met with Dr. Matloff twice.  (Id. at 644-45, 659.)
Plaintiff reported that his major goal was to maintain a healthy lifestyle in order to deal
with his alcohol recovery and PTSD.  (Id. at 659.)  He also stated that he was open to
new ways of controlling his anticipatory anxiety.  (Id. at 659.)  Dr. Matloff noted that
Plaintiff was continuing to cope with his symptoms of PTSD, which included nightmares
and disrupted sleep.  (Id. at 645.)

---

[5] See supra, note 2 regarding GAF of 31-40.

On March 10, 2005, Plaintiff expressed an interest in taking medication to sleep better to Dr. Matloff.  (Id. at 633.)  Shortly thereafter, on March 25, 2005, he was prescribed Trazodone for his sleep disorder by Dr. Neil A. Kline, a psychiatrist at the VA.  (Id. at 631-32.)

On October 26, 2006, at Plaintiff's request, Dr. Matloff wrote a letter in which he opined that Plaintiff was totally and permanently disabled as a result of having PTSD.  (Id. at 611.)  He also opined that Plaintiff's disability rating should be at 100%.  (Id.)

On January 4, 2007, Plaintiff underwent an examination by Dr. Daniel Kim, a staff physician at the VA.  (Id. at 613.)  Plaintiff described previously taking Trazodone to address his sleep issues.  (Id.)  As a result of Trazodone becoming less effective for him, he was prescribed Elavil on December 26, 2006.  (Id.)  Plaintiff reported having continued episodic flashbacks, but that his PTSD symptoms were stable.  (Id.)  Plaintiff discussed a psychotic episode that resulted in brief psychiatric hospitalization in April of 2006.  (Id.)  He believed the episode was brought on by family stresses that led to heightened anxiety and insomnia for a period of roughly 72 hours.  (Id.)  He indicated experiencing paranoia and bizarre hallucinations.  (Id.)  He stated that his symptoms were resolved within 48 hours after admission and since then he had not had a recurrence.  (Id.)

On June 13, 2007, Plaintiff met with Dr. Susan Tate for his first psychotherapy appointment since Dr. Matloff's retirement in December 2006.  (Id. at 535-36.)  Plaintiff requested the appointment because he had not slept for two nights straight, resulting in poor concentration and his "feeling squirrelly."  (Id. at 536.)  Dr. Tate and Plaintiff agreed further appointments would be on an as-needed basis since his functioning at the time did not suggest the need for more structured appointments.  (Id.)

During the latter half of 2007 and through 2008, Plaintiff underwent three check-up examinations by Dr. Thorisdottir.  (Id. at 493-97, 507-11, 529-32.)  He reported he was taking Elavil to help with sleeping, but that he felt groggy the next morning if he took it later than 6:00 p.m.  (Id. at 495, 509, 530.)  He also reported having nightmares

once per week, being hypervigilant, and having occasional intrusive thoughts.  (Id.)  The

smell of diesel and songs from the Vietnam era played on the radio triggered

flashbacks.  (Id.)  Plaintiff declined a prescription for medication to help him deal with

nightmares.  (Id. at 530.)

**B.    Ajit Raisinghani, M.D., Seagate Medical Group, Examining Physician (2007)**

Plaintiff underwent an internal medicine evaluation with Dr. Ajit Raisinghani of

Seagate Medical Group on May 22, 2007 at the request of the Department of Social

Services.  (Id. at 258-61.)  Dr. Raisinghani opined that Plaintiff had no limitations.  (Id. at

261.)

**C.    H. Douglas Engelhorn, M.D., Examining Psychiatrist (2007)**

Plaintiff underwent a psychiatric evaluation with Dr. H. Douglas Engelhorn on

June 11, 2007.  (Id. at 266-69.)  Plaintiff reported a history of hyperactivity,

hypervigilance, and insomnia.  (Id. at 267.)  He said he was able to take care of all of his

basic needs and was involved in a variety of household chores.  (Id.)  He volunteered at

the VA Hospital and Camp Pendleton two times each week.  (Id.)  He also attended

Alcoholics Anonymous ("AA") meetings four times each week, regularly used a pistol

range, and played golf with regularity.  (Id.)  Plaintiff told Dr. Engelhorn that he was

steadily employed for most of his adult life and stopped working in 1999 largely because

sobriety increased his symptoms relating to PTSD.  (Id. at 266.)

Plaintiff's mental status examination revealed: (1) an alert, cooperative, white

male appearing his stated age of 57 years; (2) adequately dressed and groomed and

probably of above average intelligence; (3) speech is normal and no unusual

mannerisms are noted; (4) appears to be in excellent physical health; and (5) fully

ambulatory without assistance.  (Id. at 267.)  Dr. Engelhorn diagnosed Plaintiff as

having PTSD, with Primary Insomnia, and Alcohol Dependence in Full Remission.  (Id.

at 268.)  Dr. Engelhorn opined that Plaintiff had no cognitive impairment, could perform

simple, repetitive tasks as well as complex and detailed work, and assigned Plaintiff a

1   GAF score of 65-70.[6]  (Id. at 268-69.)

2   **IV.  THE ADMINISTRATIVE HEARING**

3          The ALJ conducted an administrative hearing on February 4, 2010.  (Id. at 26.)

4   **A.      Plaintiff's Testimony**

5          Plaintiff testified at the hearing on February 4, 2010.  (Id. at 27-36.)  Plaintiff

6   stated he was sixty years old and lived with his wife, whom he married in 2007.  (Id. at

7   27, 29.) In addition, he stated that, at the time of the hearing, he had a thirty year old

8   son and a twenty-four year old daughter.  (Id. at 29.)  Plaintiff received his Bachelor's

9   Degree from American University, a Master's Degree in Business Administration in

10  1986 from Georgetown University, and a Master's Degree in Information Technology in

11  1996 from George Washington University.  (Id. at 27, 30.)  Plaintiff testified that he was

12  steadily employed from 1966 to 1999.  (Id. at 30.) Plaintiff last worked full-time in 1999

13  as a program manager on a contract he secured with the Department of Housing and

14  Urban Development.  (Id. at 27.)  In 2001 and 2002, he periodically worked part-time as

15  a pedicab driver until he "could not handle it."  (Id.)

16         Plaintiff testified that his PTSD was caused by something he was exposed to in

17  the military.  (Id. at 30.)  While in the military, Plaintiff was involved in combat and,

18  specifically, was at Mount Jordan for Black September.  (Id.)  He received two purple

19  hearts, a combat action ribbon, and a Vietnamese Cross of Gallantry.  (Id.)

20         Plaintiff testified that he had problems with alcohol and until his last drink on

21  December 8, 1999, he had been drinking daily.  (Id. at 29, 31.)  He came to San Diego

22  in 1999 and stayed with his parents for about two weeks before going into the VA.  (Id.

23  at 34.) After the VA, he lived in a halfway house and then moved to a sober living

24  environment where he remained until he married.  (Id.)

25         Plaintiff testified that after he became sober, he got in touch with feelings that he

26  had been suppressing.  (Id. at 31.)  He thought he was losing his mind, had almost daily

27  intrusive thoughts, had trouble sleeping, increasingly gnawed on his teeth, and was

28

---

       [6] See supra, note 3 regarding GAF of 61-70.

11cv01439

seeking to isolate more often than not.  (Id. at 31, 32.)  Plaintiff indicated he still suffered from insomnia and averaged four to five hours of sleep per night; however, about once or twice per week he did not sleep at all.  (Id. at 32.)  He said he took sleeping pills to control his sleep, but was careful to take the pills at recommended times.  (Id.)  He was admitted to the hospital for three days in 2006 as a result of not sleeping for four or five days.  (Id. at 31.)  He also said he had nightmares at least once or twice per week.  (Id.)  Plaintiff testified he was given a 100% VA rating in February 2004 based on PTSD.  (Id. at 28.)  He has been treated ever since receiving the rating and there has been no improvement.  (Id. at 28.)

Plaintiff stated he attended group counseling for PTSD once per month for ninety minutes.  (Id. at 29.)  He counseled other soldiers at two VA hospitals twice per week for anywhere from forty-five minutes to two hours.  (Id. at 32, 33.)  He also drove, cooked, cleaned, bathed himself, and paid his bills.  (Id. at 33.)  He said he believed he would not be able to hold down a job because of feeling exhausted periodically.  (Id.)  He stated he would probably miss one or two days of work per week because of his sleep issues.  (Id.)  He added that he had hearing problems in both ears, as well as knee issues from when he was wounded.  (Id. at 34.)

In response to questions posed by the medical expert, Plaintiff stated he was unsure of the name of the sleeping pill he took, but mentioned that it typically was a one dose pill that he took almost every night.  (Id. at 35.)  He testified that the sleeping pill worked more often than not, but periodically it did not work and he was unable to sleep.  (Id.)  Plaintiff also told the medical expert that he did not wear any hearing aides, but had a 35-40% hearing loss in his right ear and about a 20% loss in his left ear.  (Id. at 36.)  Lastly, Plaintiff stated that he went to about six AA meetings per week.  (Id.)

**B.   Medical Expert Testimony**

Miriam Sherman, M.D., testified as a medical expert ("ME") at the administrative hearing held on February 4, 2010.  (Id. at 37-41.)  She testified that Plaintiff did not meet

11cv01439

or equal any of the Listings in the Listing of Impairments.[7]  (Id. at 37.)  She opined that Plaintiff did not seem to have any restriction of activities of daily living.  (Id.)  She also opined that Plaintiff had mild difficulties maintaining social functioning and concentration.  (Id.)  She stated Plaintiff could do simple repetitive or more complex tasks, public or non-public.  (Id.)

**C.    Vocational Expert Testimony**

Vocational expert ("VE") Mary Jesko, Ph.D., testified at the administrative hearing held on February 4, 2010.  (Id. at 41-42.)  She categorized Plaintiff's previous work as a project manager under Dictionary of Occupational Titles ("DOT") number 189.117-030 and as manager of computer operations under DOT number 169.167-082.  (Id. at 42.)  She testified that the complexity level of each of these jobs requires a need to apply principles of logic or scientific thinking to define problems, collect data, establish facts, draw conclusions, and an ability to interpret an extensive variety of technical instructions in mathematical or diagramed form.  (Id.)

**V.  THE ALJ DECISION**

After considering the record, ALJ Carletti made the following findings:

. . . .

2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of March 1, 2002 through his date last insured of December 31, 2004 [citation omitted].

3.    Through the date last insured, the claimant had the following severe impairment: posttraumatic stress disorder [citation omitted].

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in [the Social Security Regulations].

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels and could perform simple repetitive tasks or more complex tasks, and in a public or non public setting.

---

[7]The Listing of Impairments in the Social Security Regulations ("Listings") sets forth certain impairments which are considered to be of sufficient severity to prevent the performance of any gainful activity.  See 20 C.F.R. § 404.1525(a); 20 C.F.R. pt. 404, subpt. P, app. 1.

11cv01439

6.    Through the date last insured, the claimant was capable of performing past relevant work as a regional manager.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity [citation omitted].

7.    The claimant was not under a disability, as defined in the Social Security Act, at any time from March 1, 2002, the alleged onset date, through December 31, 2004, the date last insured [citation omitted].

(Id. at 13-20.)

## VI.  STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show: (1) he or she suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  See 42 U.S.C. § 423(d)(1)(A), (2)(A).  An applicant must meet both requirements to be "disabled."  Id. Further, the applicant bears the burden of proving that he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

## A.    Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled."  The five steps are as follows:  (1) Whether the claimant is presently working in any substantial gainful activity.  If so, the claimant is not disabled. If not, the evaluation proceeds to step two.  (2) Whether the claimant's impairment is severe.  If not, the claimant is not disabled.  If so, the evaluation proceeds to step three. (3) Whether the impairment meets or equals a specific impairment listed in the Listing of Impairments.  If so, the claimant is disabled.  If not, the evaluation proceeds to step four. (4) Whether the claimant is able to do any work he has done in the past.  If so, the claimant is not disabled.  If not, the evaluation continues to step five.  (5) Whether the

11cv01439

1   claimant is able to do any other work.  If not, the claimant is disabled.  Conversely, if the

2   Commissioner can establish there are a significant number of jobs in the national

3   economy that the claimant can do, the claimant is not disabled.  20 C.F.R. § 404.1520;

4   see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

5   **B.    Judicial Review**

6          Sections 205(g) and 1631(c)(3) of the Social Security Act allow unsuccessful

7   applicants to seek judicial review of the Commissioner's final agency decision.  42

8   U.S.C.A. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The

9   Commissioner's final decision should not be disturbed unless:  (1) The ALJ's findings

10  are based on legal error or (2) are not supported by substantial evidence in the record

11  as a whole.  Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 973 (9th Cir.

12  2000).  Substantial evidence means "more than a mere scintilla but less than a

13  preponderance; it is such relevant evidence as a reasonable mind might accept as

14  adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir.

15  1995).  The Court must consider the record as a whole, weighing both the evidence that

16  supports and detracts from the ALJ's conclusion.  See Mayes v. Massanari, 276 F.3d

17  453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573,

18  576 (9th Cir. 1988).  "The ALJ is responsible for determining credibility, resolving

19  conflicts in medical testimony, and for resolving ambiguities."  Vasquez v. Astrue, 572

20  F.3d 586, 591 (9th Cir. 2009) (citing Andrews, 53 F.3d at 1039).  Where the evidence is

21  susceptible to more than one rational interpretation, the ALJ's decision must be

22  affirmed.  Vasquez, 572 F.3d at 591 (citation and quotations omitted).

23         Section 405(g) permits this Court to enter a judgment affirming, modifying, or

24  reversing the Commissioner's decision.  42 U.S.C.A. § 405(g).  The matter may also be

25  remanded to the SSA for further proceedings.  Id.

26  **VII. DISCUSSION**

27         Plaintiff contends the ALJ's decision to deny him disability benefits was not

28  supported by substantial evidence.  Plaintiff makes the following arguments: First, the

1  ALJ failed to properly consider the opinion of Plaintiff's treating psychologist; and

2  second, the ALJ failed to reject Plaintiff's testimony with specific, clear, and convincing

3  reasons.

4  **A.    The ALJ Did Not Meet His Burden of Articulating Specific and Legitimate**

5  **Reasons for Rejecting Plaintiff's Treating Psychologist's Opinion**

6        Plaintiff first contends the ALJ failed to properly consider the opinion of Plaintiff's

7  treating psychologist, Dr. Matloff, and rejected his opinion without providing specific,

8  clear, and convincing reasons.  (Pl.'s Mem. at 5-6.)  In response, Defendant contends

9  the ALJ properly rejected the opinion of Plaintiff's treating psychologist in favor of the

10  ME Dr. Sherman's opinion.  (Def.'s Opp'n at 4-6.)

11        Ninth Circuit case law distinguishes among the opinions of three types of

12  physicians: "(1) those who treat the claimant (treating physicians); (2) those who

13  examine but do not treat the claimant (examining physicians); and (3) those who neither

14  examine nor treat the claimant (nonexamining physicians)."  Lester v. Chater, 81 F.3d

15  821, 830 (9th Cir. 1996).  "As a general rule, more weight should be given to the opinion

16  of a treating source than to the opinion of doctors who do not treat the claimant."  Id.

17  (citing Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987)).  While the ALJ may

18  disregard a treating physician's opinion regardless of whether that opinion is

19  contradicted, "where the treating doctor's opinion is not contradicted by another doctor,

20  it may be rejected only for 'clear and convincing' reasons" supported by substantial

21  evidence in the record.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989);

22  Lester, 81 F.3d at 830 (citing Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991)).

23  The same rule applies to the opinions of an examining physician in the absence of any

24  legitimate conflicting testimony and any reason for the ALJ's rejection of the examining

25  physician's opinion.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

26  Magallanes, 881 F.2d at 751.

27        If the treating physician's opinion is contradicted by another doctor, it may be

28  rejected only for "specific and legitimate" reasons supported by substantial evidence in

11cv01439

1    the record.  Lester, 81 F.3d at 830 (citing Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.

2    1983)).  Similarly, an ALJ may reject the testimony of an examining, but nontreating

3    physician, in favor of a nonexamining, nontreating physician when the ALJ gives specific

4    and legitimate reasons supported by substantial evidence in the record.  Lester, 81 F.3d

5    at 830-31.  "The ALJ can meet this burden by setting out a detailed and thorough

6    summary of the facts and conflicting clinical evidence, stating his interpretation thereof,

7    and making findings."  Magallanes, 881 F.2d at 751 (citing Cotton v. Bowen, 799 F.2d

8    1403, 1408 (9th Cir. 1986)).

9         Here, the ALJ mentioned Dr. Matloff's 2005 reports briefly, but did not explicitly

10   "reject" any of Dr. Matloff's opinions or findings.  (See Admin. R. at 18.)  Defendant

11   contends that the ALJ discussed Dr. Matloff's opinion at length.  (Def.'s Mot. at 4.)  The

12   Court disagrees with Defendant and finds that the ALJ ignored Dr. Matloff's opinions

13   and findings throughout the majority of his decision, especially those from before 2005.

14   The ALJ also ignored two letters written by Dr. Matloff in 2002 and 2006 in which Dr.

15   Matloff opined that Plaintiff was totally and permanently disabled.  (See Admin. R. at

16   609-11.)  The ME, while testifying at the administrative hearing, contradicted portions of

17   the opinion of Dr. Matloff (GAF score and severity of PTSD symptoms).  To the extent

18   Dr. Matloff's opinion was contradicted, the ALJ was required to proffer specific,

19   legitimate reasons to reject or discount the opinions.  Although the ALJ appears to have

20   implicitly rejected the opinion of Dr. Matloff by ignoring it and relying virtually exclusively

21   instead upon the opinion of the ME, this was not a sufficient rejection of Dr. Matloff's

22   opinion under the relevant authority.  See, e.g., Hammock v. Bowen, 879 F.2d 498, 502

23   (9th Cir. 1989) (finding that the ALJ's failure to offer any reasons as to why he

24   disregarded the claimant's treating physician's opinions was error); Lester, 81 F.3d at

25   830-31 (requiring articulation of specific and legitimate reasons supported by substantial

26   evidence to discount testimony of examining physicians).

27        Additionally, it was insufficient for the ALJ to merely rely on the fact that the ME

28   had reviewed all evidence in the record in giving her opinion more weight than the

11cv01439

1   opinion of Dr. Matloff.  Unless the opinions of a nontreating source are based on

2   independent clinical findings, they may serve as substantial evidence only when they

3   are supported by and consistent with other evidence in the record.  See Andrews, 53

4   F.3d at 1041.  The opinion of the ME, who never examined Plaintiff, was not based on

5   her own independent clinical findings and was not consistent with all other evidence in

6   the record, and thus her opinion alone could not constitute substantial evidence.  See

7   Andrews, 53 F.3d at 1041.

8          The ALJ's failure to properly address Dr. Matloff's opinion was not sufficient

9   under the relevant authority, and constitutes legal error.  See Hammock, 879 F.2d at

10  502 (ALJ's failure to offer any reasons as to why he disregarded the claimant's treating

11  physician's opinions was legal error); Lester, 81 F.3d at 830-31 (requiring articulation of

12  specific and legitimate reasons supported by substantial evidence to discount testimony

13  of treating physicians).  Given Dr. Matloff's extensive role in Plaintiff's treatment history,

14  Dr. Matloff's opinions warranted more consideration and discussion than provided in the

15  ALJ's decision.  See, e.g., 20 C.F.R. § 404.1527 ("Generally, we give more weight to

16  opinions from your treating sources, since these sources are likely to be the medical

17  professionals most able to provide a detailed, longitudinal picture of your medical

18  impairment(s) and may bring a unique perspective to the medical evidence that cannot

19  be obtained from the objective medical findings alone. . . .").

20         In sum, the record does not support the ALJ's implicit rejection of, or failure to

21  adequately discuss, the opinion of Dr. Matloff.  The Court finds, absent a proper

22  rejection or discounting of Plaintiff's treating doctor's opinion, the opinion of Dr. Matloff

23  should have been considered at the ALJ's step three analysis of whether Plaintiff's

24  impairments "medically equaled" or "functionally equaled" a disability listed in the

25  Listings of Impairments.  "If additional proceedings can remedy defects in the original

26  administrative proceedings, a social security case should be remanded."  Lewin v.

27  Schweiker, 654 F.2d 631, 635 (9th Cir. 1981).  Accordingly, remand is proper.  See

28  McAllister v. Sullivan, 888 F.2d 599, 603-04 (9th Cir. 1989).  The Court, therefore,

11cv01439

1   recommends Plaintiff's motion for summary judgment on this issue be GRANTED, and

2   the ALJ, upon remand, be required to provide further consideration of Dr. Matloff's

3   opinion.

4   **B.     The ALJ Failed to Articulate Clear and Convincing Reasons for Finding**

5   **         Plaintiff's Subjective Symptom Testimony Not Credible**

6          Plaintiff next contends the ALJ failed to reject Plaintiff's testimony with specific,

7   clear, and convincing reasons.  (Pl.'s Mem. at 6-7.)  Defendant counters by arguing the

8   ALJ provided legally sufficient reasons for finding Plaintiff's testimony less than credible.

9   (Def's. Opp'n at 6-8.)

10         In determining a claimant's residual functional capacity, the ALJ must consider all

11  relevant evidence in the record, including medical records, lay evidence, and "the

12  effects of symptoms, including pain, that are reasonably attributed to a medically

13  determinable impairment."  See Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th

14  Cir. 2006) (citing SSR 96-8p, 1996 WL 374184, at *5).  "Careful consideration must be

15  given to any available information about symptoms because subjective descriptions

16  may indicate more severe limitations or restrictions than can be shown by objective

17  medical evidence alone."  Id. (citing SSR 96-8p)  An ALJ may not disregard a

18  claimant's testimony regarding her subjective symptoms solely because it is not

19  substantiated affirmatively by objective evidence.  Robbins, 466 F.3d at 883.  "[T]o

20  discredit a claimant's testimony when a medical impairment has been established, the

21  ALJ must provide 'specific, cogent reasons for the disbelief.'"  Orn v. Astrue, 495 F.3d

22  625, 635.  Here, the ALJ set forth the following reasons for finding the Plaintiff was not

23  credible:

24         First, the claimant has not taken medications consistent with complaints of
           disabling symptoms or limitation for any period of twelve continuous
25         months.  Claimant testified he is not taking any medications, and Dr.
           Matloff on March 10, 2005, stated claimant had never taken psychotropic
26         medications [citation omitted].

27         Second, although the claimant was found disabled by the VA due to
           posttraumatic stress disorder with alcohol dependance [citation omitted],
28         claimant testified he has been sober since December 8, 1999, and Dr.
           Sherman testified claimant's alcohol dependence is in full remission.

Third, the claimant did not allege an inability to provide his own personal care.  Dr. Engelhorn in his consultative examination reported claimant's daily activities consisted of living at home with his wife.  He was capable of taking care of his personal needs.  He was involved in a variety of household chores including cooking, cleaning, and grocery shopping.  He volunteers at the VA hospital two times each week.  He also volunteers at Camp Pendleton two times each week.  He attends AA meetings four times each week.  He regularly uses the pistol range where he enjoys practicing firing pistols.  He plays golf with regularity [citation omitted].  Additionally, claimant testified he is able to cook, clean, and take care of his personal needs.

Fourth, Dr. Matloff on May 5, 2005, reported claimant had gone on a Caribbean cruise with his girlfriend which went fairly well.  Dr. Matloff reported claimant was somewhat anxious but mental status exam was within normal limits with no current SI/HI [citations omitted].

(Admin. R. at 19.)

The ALJ's first proffered reason for finding Plaintiff's testimony not credible is unsupported by the record.  The ALJ states that Plaintiff testified that he is not taking any medication.  (Id. at 19.)  In fact, Plaintiff testified three separate times that he is taking sleeping pills.  (Id. at 28, 32, 35.)  Also, the ALJ states that on March 10, 2005, Dr. Matloff noted that Plaintiff has never taken psychotropic medications for any period of twelve consecutive months.  (Id. at 19.)  However, the record reflects that on March 25, 2005, just fifteen days after his meeting with Dr. Matloff, Plaintiff began taking Trazodone, a psychotropic medication.  (Id. at 631-632.)  Although the record is unclear as to how long Plaintiff took Trazodone, the record demonstrates that on January 4, 2007, Plaintiff was taking Elavil, a different type of psychotropic medication.  (Id. at 613.)  Subsequent notes by Dr. Thorisdottir state that Plaintiff was still taking Elavil on April 4, 2008 and August 29, 2008.  (Id. at 496-497, 509-510.)  There is nothing in the record to suggest that there was a period of time where Plaintiff was not taking Elavil between January 4, 2007 and August 29, 2008.  Thus, the first reason proffered by the ALJ to discredit Plaintiff's subjective symptom testimony does not constitute a clear and convincing reason supported by substantial evidence.

The ALJ's rejection of Plaintiff's testimony on the basis that the VA's finding he was disabled due to PTSD with alcohol dependance was inconsistent with Plaintiff's

18

1  testimony that he has been sober since December 8, 1999 was also in error.  Curiously,

2  the ALJ noted that Social Security regulations prohibit a finding of disability based on

3  alcohol or drug dependence, but he gave no consideration to Plaintiff's PTSD

4  symptoms.  (Id. at 19.)  The key factor in determining whether the substance abuse is a

5  contributing factor material to the determination of disability is whether the claimant

6  would still be found disabled if he stopped using alcohol and/or drugs.  See 20 C.F.R. §

7  416.935(b)(2); Sousa v. Callahan, 143 F.3d 1240, 1245 (9th Cir. 1998).  Here, Plaintiff

8  testified that his PTSD symptoms appeared after he became sober.  (Admin. R. at 31-

9  32.)  Dr. Matloff's first diagnosis of solely PTSD occurred on November 20, 2000,

10  almost one year after Plaintiff's last alcoholic drink.  (Id. at 747.)  Thus, the second

11  reason proffered by the ALJ to discredit Plaintiff's subjective symptom testimony does

12  not constitute a clear and convincing reason supported by substantial evidence.

13        With respect to the ALJ's third finding, the Court finds that the ALJ's rejection of

14  Plaintiff's complaints based on his daily activities (cooking, cleaning, grocery shopping,

15  volunteering at the VA Hospital and Camp Pendleton, attending AA meetings, using the

16  pistol range, and playing golf) is not supported by substantial evidence. The ALJ relied

17  on Dr. Engelhorn's report that noted Plaintiff volunteers at the VA Hospital and Camp

18  Pendleton twice per week and he attends AA meetings four times per week.  (Id. at 267

19  [emphasis added].)  Dr. Engelhorn's report also noted that Plaintiff was involved in

20  cooking, cleaning, grocery shopping, firing pistols, and playing golf, but there is no

21  evidence he performs these activities daily.  (See Id. at 267.)  More importantly,

22  however, in order to discredit Plaintiff's complaints based on evidence of daily activities,

23  the ALJ must find that Plaintiff is able to spend a substantial part of the day engaged in

24  pursuits that involve physical functions that are transferable to a work setting.  Gonzalez

25  v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990).  While the activities Plaintiff performs

26  do require a sedentary level of exertion, the ALJ did not make the requisite specific

27  findings concerning the transferability of Plaintiff's activities of daily living to his ability to

28  perform work.  Thus, the third reason proffered by the ALJ to discredit Plaintiff's

1  subjective symptom testimony does not constitute a clear and convincing reason

2  supported by substantial evidence.

3        It strains reason to understand how the ALJ's fourth proffered reason for finding

4  Plaintiff not credible--that Plaintiff was able to take a cruise with his girlfriend in 2005

5  with only mild anxiety--weighs against Plaintiff.  Defendant has provided no explanation

6  as to why this constitutes a clear and convincing reason to reject Plaintiff's subjective

7  symptom testimony and the Court cannot think of any reason why it would.

8        In sum, none of the above listed reasons sufficiently address why Plaintiff's

9  testimony regarding his impairment is not credible.  The Court recommends Plaintiff's

10 motion for summary judgment on this issue be GRANTED, and the ALJ, upon remand,

11 be required to reconsider Plaintiff's credibility.

12 **VIII.  CONCLUSION**

13       For the reasons set forth above, Plaintiff's motion for summary judgment should

14 be **GRANTED**, Defendant's cross-motion for summary judgment should be **DENIED**,

15 and the case should be remanded for further proceedings.

16       This report and recommendation will be submitted to the Honorable William Q.

17 Hayes, United States District Judge assigned to this case, pursuant to the provisions of

18 28 U.S.C. § 636(b)(1).  Any party may file written objections with the Court and serve a

19 copy on all parties on or before **September 19, 2012**.  The document should be

20 captioned "Objections to Report and Recommendation."  Any reply to the Objections

21 shall be served and filed on or before **October 3, 2012**.  The parties are advised that

22 failure to file objections within the specified time may waive the right to appeal the

23 district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

24       **IT IS SO ORDERED**.

25 DATED:  August 20, 2012

26                                                    Jan M. Adler
                                                     U.S. Magistrate Judge

27

28